Good morning, your honors. My name is David Ornbell. I'm here to present the argument on behalf of the appellants. Thank you for your time and consideration, first and foremost. The primary issue, I think, here is, number one, that we have a very low threshold in terms of whether a pleading state's notice of pleading states facts upon which relief can be granted. And I think when you look at this particular set situation for that prism, we have a whole host of facts, any of which independently can lead to the relief under this complaint. And I think that the district court failed to take into consideration the facts that were being pled as opposed to an underlying theme that these are disgruntled investors who are seeking their money back from somebody who is not responsible for the loss. So let me talk about that in particular. It's alleged, and I think that facts regarding what Pearson admitted to later on about the investments show that Pearson was a disqualified individual from the inception of these investments, and that the defendants and all of them knew this not only because of their intimate involvement. Remember, he was a franchisee of the parent company, but also because they did their own internal investigation regarding the investments that he was going to put this to, and they transferred the money directly to his account. It's a specific violation, so the question becomes, and I'm going to concede for the purposes of this particular argument, this portion of the argument, that they're not even fiduciaries, but we have a contractual relationship that has a feature of trust and confidence, and I think you clearly have that here because these are custodians. I mean, I think he used the term custodian, it's used loosely in this context, but if he used the term custodial position in any other context, it comes with an element of trust and care. And the trust and care arising from this contractual situation should have led the defendants to disclose to these parties that they are investing with a disqualified investor, and they didn't do that. I think that the common law regarding the concealment of fact is compelling, that they should have made that disclosure at the inception, and if in fact the court agrees with that, that would make potentially them liable for the entire investment itself. Counselor, your time is going quickly, and I think there's a lot of detail in here, and I would really like me to get to some questions about statute of limitations, and I'd also like you to get to the question as to whether Mrs. White is elderly. Okay, well, she is elderly by the pleading that alleges that she's elderly. She's not elderly as of the time, but from the pleading, if that's correct. She's not elderly as of the time that the fraud was perpetrated on her. Well, but Your Honor, so I was going to get to this argument independently, but let's just take it now with respect to the statute of limitations. You recall in the pleading that she has a phone call with the actual defendant, Mr. Brahma, who's an executive at this company, and he tells her, hey, you know what, there's nothing we can do about the reporting of your asset at a value other than zero. There's nothing we can do about it. We rely on what Mr. Pearson tells us. Well, that's absolutely incontroversial. What the IRS code says is that the custodian has the duty to go out and find the valuation of the asset. And, in fact, during that conversation, which I believe was 2013, and it was shortly before the pleading was filed, if my memory serves me correctly, but it was certainly within three years of the pleading being filed, nevertheless. And at that point in time, they continue from that point forward on an asset that they know is valued at zero. And how old was she in 2013? Your Honor, I don't have a specific answer to that question in the pleading. I know that a complaint was filed. The complaint was filed in March of 2013. And she was about 65. Your Honor, it's really not an issue. I was really focused on the concealment aspect of the complaint. And that's where I think that, in the broadest sense of what the test underneath was, provides a basis for a monetary relief and a claim upon which relief can be granted. And the fact that they continued to send out statements, not only in her case, but also in Ms. Moran's case, it's a continuing tort, and it's a continuing tort that is based materially on a breach of duties under the IRS Code. But also, the mere fact that Brahma is telling her that there's nothing we can do about this is a misrepresentation. It's a concealment effect, and it's something that there's two aspects of this. In terms of the way I see it, there's two aspects of what this concealment gives rise to. Number one, it gives rise to a continuing obligation on the part of Antrust to do something. And number two, it gives them the right to collect fees. And it doesn't really need you to come down the ladder of abstraction. You're dealing at a very, very high level, and I need you to be very, very specific. So you have two clients who are here before us today, Mr. Moran and Ms. White. They have slightly different circumstances in terms of when they invested with Mr. Pearson. And so we have a, if you're going to talk about a fraud question, we have a three-year statute of limitations. I need you to be very specific, please, and tell me why Mr. Moran could file this fraud, why Ms. White can't. And then you'll need to turn to the RICO questions and deal with some similar questions there. Well, Your Honor, with respect to Mr. Moran, the allegations regarding his interactions with the company are at pages 126 and 127 of the excerpt. And there he contacts, he files the complaint in 2013, you know, with three-year statute of limitations. That is correct. And in mid-2011, he's found after receiving it, this is paragraph 183 on page 34 of the complaint, page 126 of the excerpt, that in mid-2011, after receiving conflicting information from Mid-South, which is the franchising and trust, he calls up and said, number one, finds out that Pearson is no longer with the company. But that's, Counsel, these are wonderful arguments. This is not the basis on which the district court dismissed your complaint. The district court said that he knew as of 2008. The question is not how late did he know. The question is how early did he know. No, no, Your Honor, that goes, that's a different issue. With due respect, that's a different issue. That's an issue that goes to whether antrust can be tagged with the entire investment. The continuing fraud of part of antrust is that after they know that the investment is worth zero, they continue to send out statements that show the value at a different market value, and they continue to collect fees for the management of an account that is all but dead. And the only reason it's kept alive is for them to charge our clients money. And that's the basis for the concealment claim. It's two prongs, Your Honor. The first prong goes to attacking the whole investment itself. The second prong, and it's on the ledge in the complaint, has a separate form of injury, which is the continuing obligation on their part to accurately report the value. And once they've reported the actual value, if they had done it in a timely fashion, the contract would have been terminated, and their ability to collect fees would have ceased. But instead, they kept the ruse going solely for the purpose of collecting the fees, and that's the basis for that portion of the damage claim. So even if you reject the portion of the claim that relates to the investment liability, you still have a portion of the claim that relates to their ongoing duty to report the accurate value. And the fact that they did not do so, and they continue to do not do so, it's a continuing tort, they continue to conceal it. At least within three years of the filing of the complaint, you might have a statute of limitations in the situation that bars you from going back beyond three years to collect damages for what occurred before that three-year period. But clearly, within the three years of the filing of the complaint and forward, in fact, you have a company that is normally sending out false information and specifically charging a fee based upon that. And I notice my time is running out. I just want to touch on one other issue, and this is kind of a secondary issue, but with respect to whether they are fiduciaries. They clearly disavow that in every written document and, you know, multiple times in multiple ways. So there's no doubt that they are aware of what the ramifications of being a fiduciary are. Well, I'm not so aware because if I read the opposite of your statement, I cleared in the California Appellate 1985, it says, even in the case of a special relationship, once a plaintiff becomes aware of facts which would make a reasonably prudent plaintiff person suspicious, the duty to investigate arises, and the plaintiff may then be charged with knowledge of the facts which he could have discovered by such an investigation. And so in that case, even with the special relationship, he has three years from the time a reasonably prudent person would have been suspicious, even with the relationship. So if I look at that, then I'm back to where Judge Bivey is again. Well, Your Honor, with all due respect, I don't think that applies to this continuing obligation to send them to fair market value because remember, Brahma tells White specifically, I can't do anything about them. We rely on the valuations that are given by Pearson. Oh, but just a minute. If a note is in default due to nonpayment, he's called to find out what the deal is all about that. If he's received no financial information about the paying entity, and he calls and finds out nothing about it, if the investment statements don't accurately reflect what's in the account, and all of this is happening, it's hard for me to say that a reasonably prudent person isn't suspicious. Your Honor, but that's not the point. The point is what is the point. That's what the case says. When this reasonably prudent person is suspicious, the duty arises. That goes to the issue of the underlying investment, not their continued duty to provide an accurate valuation. Well, in your mind, this is a continuing tort. So even if you're suspicious, even if you ought to do something about it, the very fact that it continues makes it such that you get three years in any event. Is that your argument? No, Your Honor. First off, I think your statement pretty simply has a false premise. I don't think it's a false premise, given what I know or I knew and what happened. I mean, his promissory note was even unsigned, and the due date was left blank. And then he doesn't get the investment statements. In my book, special relationship or not, a reasonably prudent person has to do something about it. The only way you're going to convince me is to say the three-year statute, because it continues, he gets another three years every time. And I want to know what case says that. Well, Your Honor, there's plenty of cases. I don't have them right here, but California law. You don't have them in your brief either. Well, look, I mean, everybody's familiar with the concept of a continuing tort. I understand that, but you've got to believe it. I didn't see it in your brief in any place. Your Honor, I think we've pled a continuous tort because we've pled that in 2011 as to Moran and in 2013 as to White. They're in contact with antitrust, and they're telling them we can't do anything about the valuation. Your account statements are going to remain the same, and you're going to continue to be charged. They have a credit card to charge it. So that's the conduct that is the continuing tort. Now, you could argue about notice, fiduciary duties, concealment, and everything else as to the original investment. But if you have individuals and a company that normally is sending out false statements upon which they are then extracting a fee, that's a continuing tort. And when both clients contact them and they say, I can't do anything about it, we rely on Pearson to give us the evaluations, which they know is bogus. And they know Pearson is upside down. I mean, Pearson, they said he abstonded with the money. He says he's going to sell off assets to pay back the debtors. So the situation here is can you knowingly send out statements knowing that they're false and charge a fee upon it? That's the issue. Thank you. We have one by the side. May it please the Court. My name is Mark Turner, and I'm here as counsel for defendants, the Entrust Group, Entrust Administration, Inc., and Hugh Broma. Your Honors, you know, when I step back from this case, it has always been one of confusion as one tried to discern what's really at issue in the pleadings. This comes with the backdrop, as I'm sure your Honors know, that this is the last of a trio of punitive class action cases brought against my clients. It was submitted to the Court that motions to dismiss were granted in the Northern District of California in the Brissett case being affirmed by the Ninth Circuit just last year. There was a First Amendment complaint filed there and then a motion denied to file a Second Amendment complaint. What's the name of this complaint? Your Honor. What does that have to do with this case? I'll move on, Your Honor. But my point is that there have been nine pleadings that I count over three cases. This is the last of the cases or the last of the pleadings that do not state a claim against my clients. And for counsel to come today and invent a new theory, not argued or pled nonetheless in this case, is how to get rid of it. And the new theory that you're today is what? Continuing fraud to somehow beat a clear statute of limitations defense. I thought it was in the briefs. It was the claim that they kept issuing statements that showed a value that wasn't there and then they were committed to using them. True. They did assert that these statements were essentially unchanged. And, Your Honor, I'll submit that both the contracts, the bidirection letter and the account agreement in this case, do not impose any duty on my clients, the entities who are record keepers and administrators, purely relying only on the information that they receive. They have no duty whatsoever to go out and discern what the real information or value actually is. And, in fact, Your Honor, we cited this in our brief. There's a SEC guidance issued in 2011, not that it was available to either of the plaintiffs in this case at the time, but it makes very clear how typical and common and normal it is in the self-directed IRA industry that self-directed IRA custodians are responsible only for holding and administering assets. They are not responsible for evaluating the quality or legitimacy of an investment. Most custodial agreements, self-directed custodial agreements and administration agreements, they explicitly state, explicit at least, pardon me, I'll slow down, that the custodian and administrator have no responsibility for investment performance. And to get to your point, Your Honor, may I quote here from page two of this guidance? It said, the SEC says, quote, As a result, self-directed IRA custodians often list the value of the investment as the original purchase price, the original purchase plus returns reported by the promoter or a price provided by the promoter. And in italics it goes on to say, Investors should be aware that none of these valuations necessarily reflect the price at which the investment could be sold, if at all. There is no question that it is unfortunate that these But they have claimed that the investment was worth nothing at that point, that your clients knew it. And there were lessons of closing off accounts that kept charging fees for non-existing assets. Well, Your Honor, the claims were time barred at the outset. And, Your Honor, the contracts here, as well as the case law that we've cited, make clear that there is no duty for my clients to change the account statements or go out and make independent inquiry. They rely only on the specific information that they receive. It could be from the promoter, it could be from the investor themselves. But your view is that even if your clients knew their assets were worth, as you can see on the balance of the account, they could just continue charging fees for non-existing assets. Under the structure of this arrangement, under the contracts here, under the norms in the industry, as the SEC has overviewed over the years, Your Honor, the answer is that our client had no duty to change those statements independently. They could charge fees on them even though they knew there was no value or no assets in there? They could. They could. For example, if there was a record and there was none, but the account holder wrote to them and said, change the value on my accounts, then that might be a different thing. But the underlying cause of this investment loss was the fraud promoter, who has already sustained a default judgment in this case. And the damage was done shortly after the investments were made in the late 2000s. If I may, Your Honors, I do wish to apologize for something and make a request. In the reply brief of the appellants, they make much of a SEC cease and desist order and put forth many pages in the chart showing how their allegations are similar to what was in the SEC cease and desist order. I learned in preparation for this argument, Your Honors, that on June 27, 2016, in that very matter involving Equity Trust Company, that there was a written decision issued by the Administrative Law Judge of the SEC absolving Equity Trust Company of all the wrongs that were alleged in that matter. And I would like to leave the Court to file a copy of this under Rule 28 following this hearing. Thank you, Your Honor. What can you tell us about the elder claims? The elder claims. It's clear that Ms. – I agree with you. If I can read between the lines that Ms. White was not 65 years old when she made the investment. The cases we cited are clear that the standing required under the California statute is that one must be 65 years of age at the time that the investment was made. And that is dispositive on that claim, Your Honor. Do I turn to the RICO questions? Certainly. On the RICO questions, it's hard to add anything more than is in the briefing. The Court below instructed, after dismissing the First Amendment complaint and permitting the elder abuse and RICO claims to survive for possible further amendment, made very clear that there needed to be a very specific following of Ninth Circuit and other law around the country, that the RICO, Alleged RICO person must be separate and distinct from the Alleged RICO enterprise. A common failing in this, in all of the pleadings in this case, and it's reflected in the other cases that we have seen come and go against my clients brought by these very plaintiffs' counsel, is that the complaint is a style of lumping all defendants together and trying to make them all responsible for the same thing and all acting in concert doing the same things all the time. And the RICO statute requires much more specificity than that. Interestingly, the elder abuse statute has a similar requirement that the specific wrongs of each specific defendant must be alleged. And frankly, I've always viewed the RICO claim as a while-you're-at-it claim from these plaintiffs, and it's because they had a fraud claim. If they had something actual here, it was in the fraud claim, and clearly it is time-murder. Thank you. Thank you, Your Honors. We are out of time. Would you like to take a minute or a couple? With respect to this issue on the concealment and the statutory limitations, I think it's preposterous for this interest to take the position that it can knowingly send out invoices with false values in charge of fee associated with them. In 2009, Mr. Brahma became aware of this scheme, and he allowed his company to continue to send out invoices and charge fees based on a knowingly false amount. And the IRS code, and it's alleged in the complaint, paragraph 22, subparagraph E, sets forth that it's the duty on the part of the custodian to go out and seek the value. They disavow that obligation in their contract, but that can't supersede what the law or the regulations require. And then lastly, Ms. White inquired of Mr. Brahma in 2013 about why her statement still continued to reflect this amount, and he said there's nothing we can do about it. So clearly you have a situation where there is a continuing toward. But at that point, she knows that the statements are false at that point, right? Certainly. How long does she know that they're false? Arguably from 2009 or thereabouts. And 2009 would put you three years outside the statute of limitations. Well, Your Honor, the statute of limitations is the way I view the statute of limitations in this case is they're operating under continued. They have a custodian that sends them documents that are regulated by the IRS. But they're not fooled by anything, are they? They're not being fooled by it. She knows that the statements are false. She's known that for quite some time. They're just being ripped off. That's right. Why didn't she file the case when she first realized that there was a problem? Well, Your Honor, she's in contact with them in 2011 trying to get it reduced. I mean, it's not like she's sitting down doing nothing. She contacts Brahma. She contacts Mrs. Schauser. It isn't a matter of all the things she did otherwise. It's a matter of if she knows of her problem and she doesn't go to court to do anything about it, she loses. Well, Your Honor, not when there's a continuing tort. When there's a continuing tort, the statute of limitations renews every day the tort occurs. And I think that's the situation where you have here. And I think it's played. The facts show it. And the law allows that type of claim to be made. And I thank you for time. Thank you. A silence has been ordered.
judges: Kozinski, Bybee, N.R. Smith